UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| ANTHONY STEELY,<br>Plaintiff, | : | |
| | : | |
| v. | : | No. 5:20-cv-03778 |
| | : | |
| GALEN CLEMONS,<br>Defendant. | : | |

_____

**O P I N I O N**
**Bench Trial – Judgment for Defendant on All Counts**

**Joseph F. Leeson, Jr.**                                               **December 3, 2021**
**United States District Judge**

## I.        INTRODUCTION

This matter involves the events of a traffic stop initiated by Defendant, Pennsylvania

State Police Trooper Galen Clemons, against Plaintiff Anthony Steely.  Following a high-speed

pursuit, Clemons used a Precision Immobilization Technique (PIT) maneuver to bring Steely's

vehicle to a stop.  Thereafter, Clemons discharged his service weapon a single time, striking

Steely.  Steely filed suit, asserting claims of excessive use of force and assault and battery.

A bench trial was held on August 16, 2021, with testimony concluding the same day.

The parties subsequently filed proposed findings of fact and conclusions of law.  *See* ECF Nos.

62, 63.  The following findings of fact and conclusions of law are based on the evidence

presented at trial, the legal arguments advanced by counsel on summation, and the relevant

governing law.  Based on the facts as this Court finds them and the conclusions of law drawn

from the application of those facts to the relevant law, this Court enters judgment for Clemons on

all Counts.

## II.     FINDINGS OF FACT

1.      Steely is an adult individual and a citizen of the Commonwealth of Pennsylvania, residing therein.  *See* Joint Stipulation of Facts ("JSOF") ¶ 1, ECF No. 41.

2.      Clemons is, and was at all times relevant to Steely's Complaint, a State Trooper for the Pennsylvania State Police, assigned to Troop K Media.  *See id.* ¶ 2.

3.      On June 11, 2019, Clemons was on his 7:00 AM - 3:00 PM shift, covering Highway 476 and Interstate 95 (I-95).  *See id.* ¶ 3.  Clemons was driving on I-95 Southbound at approximately 1:30 PM, when he first noticed Steely.  *See id.*

4.      At the time Clemons noticed Steely, Steely was driving from the Kensington area of Philadelphia, Pennsylvania to a job site in Brookhaven, Pennsylvania.  *See* Trial Transcript 8/16/2021, 134:8-17 ("N.T. __"), ECF No. 59.

5.      Prior to embarking on this drive, Steely bought three bags of drugs in Kensington, which he believed to be heroin.  *See id.* 132:16–133:2.  Steely had used heroin before in the past. *See id.* 133:3-4.

6.      Steely injected himself with the contents of one of the bags before leaving Kensington for Brookhaven.  *See id.* 133:7-8, 133:22-24; *see also id.* 134:8-17.

7.      A blood draw from Steely taken immediately after the incident tested positive for cocaine, methamphetamine, and fentanyl.  *See* Def. Ex. D-7 ("Toxicology Report").

8.      At around 1:30 pm, Clemons observed Steely make an abrupt lane change on I-95 Southbound.  *See* N.T. 16:16-22.  Clemons also observed Steely looking in his rear and side-view mirrors while swerving in his lane of traffic.  *See id.* 17:23–18:3.

9.      At around the same time, Clemons observed Steely driving seventy-one (71) miles per hour in a zone where the speed limit is fifty-five (55) miles per hour.  *See* JSOF ¶ 4.

10.     Clemons activated his lights and sirens to effect a traffic stop.  *See id.* ¶ 5.

11.     Clemons' police SUV was equipped with a "Mobile Video Recorder" (MVR), which was affixed to the dashboard of the SUV.  *See* N.T. 117:19-21.  The MVR is positioned so as to provide a view through the windshield of the SUV.  *See id.*

12.     The video recorded by the MVR is accompanied by audio that is captured by a microphone attached to Clemons' lapel.  *See id.* 118:3-5.

13.     Following Clemons' effort to initiate a traffic stop, Steely increased his speed in an effort to evade Clemons.  *See id.* 19:9-15; *id.* 176:13-17.

14.     Steely proceeded to lead Clemons on a high-speed pursuit on I-95 for approximately five miles.  *See id.* 19:16–20:2; *id.* 176:20-24; Def. Ex. D-1 ("Dash Cam Video").[1]

15.     During the pursuit, Steely made several abrupt lane changes, and Clemons indicated that Steely reached speeds of up to ninety (90) miles per hour.  *See id.* 19:16–20:2; *id.* 176:20-24; *id.* 33:2-5.

16.     Twice during the pursuit, Steely drove his vehicle towards an exit ramp but abruptly swerved back into the I-95 lane of travel.  *See id.* 31:22–32:16.  Clemons believed that Steely made these maneuvers in an effort to cause Clemons to crash his police SUV.  *See id.* 32:8-16; *id.* 101:4-9.

17.     Steely eventually moved onto the ramp of Exit 3B.  *See id.* 20:3-7.

18.     Once on the exit ramp, Steely made a left-hand U-turn over a concrete barrier towards the on-ramp portion of 3B.  *See id.* 177:6-10.

---

[1]     The testimony of the events that ensued during this pursuit is corroborated by the video captured by the MVR and the audio transmitted by Clemons' lapel microphone.

19.     At that same time, Clemons performed a PIT maneuver on Steely's vehicle.  *See id.* 23:16-18.

20.     Following the PIT maneuver, Steely's vehicle came to rest approximately one foot from Clemon's police SUV; both cars were facing away from one another with the side-view mirrors of each vehicle lined up with one another.  *See id.* 26:3-9.[2]

21.     At that time, Clemons observed Steely tightly gripping his steering wheel, and Clemons believed Steely was attempting to free his car from the concrete barrier on which it was resting. *See id.* 35:24–36:21.

22.     Clemons then exited his police SUV and drew his firearm.  *See id.* 33:22-24.

23.     Clemons provided a verbal warning to Steely that he would kill him.  *See id.* 38:14-17.

24.     After issuing the warning, Clemons positioned himself in front of Steely's vehicle, looking in through the front windshield.  *See id.* 40:7-11.

25.     Around this same time, Steely took off his seatbelt and moved into a squatting position on the driver seat.  *See id.* 142:5–142:2.

26.     Steely attempted to exit the vehicle from the driver side door, but he was unable to do so.  *See id.* 42:14-20.

27.     Steely tried to exit the vehicle from the passenger side door, crawling across the seats to reach it; however, he did not exit the passenger door at that time.  *See id.* 42:22–43:4.

28.     Steely returned to the driver seat.  *See id.* 43:3-8.

---

[2]     From this point forward, as a result of the manner in which the cars came to rest, the MVR no longer provides a useful view of the events.  However, audio is still available from Clemons' lapel microphone.

29.     As Steely returned to the driver seat, Clemons asked, "[n]ow what are you reaching for?"  *See* JSOF ¶ 12.

30.     Steely continued to reach towards the passenger seat to pick up a book bag from the floor area of the passenger seat.  *See* N.T. 43:6-9.

31.     Shortly thereafter, Steely reached both hands in his book bag, during which time Clemons directed Steely three times to "stop reaching."  *See id.* 43:9-12; *id.* 54:12-22.

32.     After the third time Clemons instructed Steely to "stop reaching," Steely abruptly removed his hands from the bag.  *See id.* 54:23–55:11.

33.     Clemons believed that Steely was making this abrupt motion in an effort to attack Clemons.  *See id.* 54:16-19.  Clemons believed that his life was in imminent danger.  *See id.* 68:25–69:2.

34.     Clemons' belief that his life was in imminent danger was based on the totality of events that started from the time Clemons encountered Steely and ended with Steely's abrupt motion in removing his hands from his book bag.  *See id.* 100:19–102:13.

35.     Based on this belief, Clemons discharged his service weapon one time at Steely, striking Steely in the leg.  *See id.*

36.     After Steely was struck, he removed his hands from the book bag, and Clemons could again see them.  *See id.* 106:10-12; *id.* 107:23-25.

37.     Steely then exited the vehicle through the passenger-side door.  *See id.* 59:6-7; *id.* 60:2-4.  As he exited the vehicle, Steely brought the book bag with him.  *See id.* 61:3-8.

38.     After exiting the vehicle, Steely continued to resist arrest.  *See id.* 64:7-12.

39.     Two civilian bystanders assisted officer Clemons in securing Steely so that Clemons could place handcuffs on Steely.  *See id.* 121:14-20; *id.* 122:10-15.

40.     However, even with the assistance of the two bystanders, Clemons was unable to handcuff Steely until additional Troopers arrived on scene.  *See id.* 122:3-7.

41.     Steely was transported to the Crozer-Chester Medical Center for the treatment of his injuries.  *See id.* 148:17-20.

42.     As a result of the shooting, Steely suffered the following injuries: (1) gunshot wound with associated comminuted fractures of the left tibia and fibula status post external fixator placement, followed by ORIF left tibial fracture/tibial intramedullary nail placement; (2) posttraumatic compartment syndrome, lower left leg; (3) multiple disfiguring scar formations with persistent dysesthesias, lower left extremity; and (4) posttraumatic hemorrhagic anemia requiring blood transfusion.  *See* Pl.'s Ex. 21 ("Dr. Sing Report").

43.     Steely had to undergo multiple procedures, including (1) comminuted tibial fracture reduction with external fixator placement; (2) left lower extremity compartment fasciotomy; (3) irrigation and debridement of open wounds, intramedullary interlocking nailing of the left tibia with removal of external fixator; and (4) complex closure of a left lateral open leg wound.  *See id.*

44.     In 2015, Steely was convicted of forgery and access device fraud.  *See* N.T. 130:16-19.  Steely was also previously convicted of flight to avoid apprehension.  *See id.* 130-19-22.

45.     Throughout the pursuit, Clemons maintained radio contact with his employer, providing periodic updates on his location, speed, and the degree of traffic.  *See generally* Dash Cam Video.

46.     Throughout the pursuit and the events that followed, Clemons was acting in his role as a state trooper.  *See* N.T. 125:1-3.  Clemons encountered Steely while driving his marked police SUV and while wearing his full uniform.  *See id.* 13:8-13.

47.     It was part of Clemons' duties to follow Steely after observing suspicious lane changes.  *See id.* 125:4-6.  It was part of Clemons' duties to apprehend Steely after Steely failed to yield for a routine traffic stop.  *See id.* 125:7-9.

48.     It was part of Clemons' duties to use force, if necessary, to effect that apprehension.  *See id.* 125:19-25.

49.     The Pennsylvania State Police trains its officers on the use of force, including the use of deadly force.  *See id.* 123:19-25.

50.     The Pennsylvania State Police has a policy involving the use of deadly force.  *See* 124:1-3.

## III.   LEGAL STANDARDS

### A.     Fourth Amendment Excessive Force Claim – Review of Applicable Law

The Fourth Amendment protects ones' right to be secure from unreasonable seizure.  U.S. CONST. AM. IV.  Claims of excessive force are analyzed under the law governing unreasonable seizure.  *See Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004).  "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a seizure occurred and that it was unreasonable."  *See id.* (quoting *Estate of Smith v. Mascaro*, 318 F.3d 497 (3d Cir. 2003)).

Reasonableness, in the Fourth Amendment context, is measured by asking whether, under the totality of the circumstances, "the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or

motivations."[3]  *See id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  In assessing

reasonableness, courts are to consider factors including "the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether

he actively is resisting arrest or attempting to evade arrest by flight."  *See id.* (citing *Graham*,

490 U.S. at 396).  Courts may also consider

> the possibility that the persons subject to the police action are themselves violent
> or dangerous, the duration of the action, whether the action takes place in the
> context of effecting an arrest, the possibility that the suspect may be armed, and the
> number of persons with whom the police officers must contend at one time.

*See id.* (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)).

A court must judge reasonableness "from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight."  *See id.* (citing *Graham*, 490 U.S. at 396-

97).  "[R]easonableness under the Fourth Amendment should frequently remain a question for

the jury . . . ."  *See id.* (quoting *Abraham*, 183 F.3d at 290).

Where deadly force is involved, the use of force "will only be considered reasonable . . .

when 'it is necessary to prevent escape and the officer has probable cause to believe that the

suspect poses a significant threat of death or serious physical injury to the officer or others.'"

*See Abraham*, 183 F.3d at 288 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).

Accordingly, the Third Circuit has set forth the inquiry for the use of deadly force as follows:

> Giving due regard to the pressures faced by the police, was it objectively reasonable
> for the officer to believe, in light of the totality of the circumstances, that deadly
> force was necessary to prevent the suspect's escape, and that the suspect posed a
> significant threat of death or serious physical injury to the officer or others?

---

[3]      The officer's subjective intentions are irrelevant to the inquiry.  *See Abraham v. Raso*,
183 F.3d 279, 289 (3d Cir. 1999) (noting good intentions will not cure an objectively
unreasonable use of force and bad intentions will not mar an otherwise objectively reasonable
use of force (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989))).

*See id.* at 289.

Because reasonableness requires inquiry into the "totality of the circumstances," the Third Circuit has made clear that a reviewing court may consider "all of the events transpiring during the officer['s] pursuit of [the suspect] . . . in evaluating the reasonableness of [the officer's] shooting" *See id.* at 292 (expressly rejecting Eighth, Ninth, and Tenth Circuit line of cases that categorically excluded review of pre-seizure events from Fourth Amendment analysis).

### B.      Qualified Immunity – Review of Applicable Law

"Qualified immunity is not merely immunity from liability, but rather immunity from suit, operating to free the recipient from the burdens of litigation." *Muth v. Woodring*, 666 F. App'x 137, 138 (3d Cir. 2016) (citing *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014)).

Questions of qualified immunity require a two-facet analysis:

(1) The first facet "probes whether the allegations, '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right[.]'" *See id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); and

(2) The second facet asks "whether the law was clearly established at the time of the violation." *See id.* (quoting *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d. Cir. 2010)). A law is clearly established if, "at the time of the challenged incident, [it] is sufficiently clear to 'provide[] fair warning to the defendants that their alleged conduct was unconstitutional.'" *Muth*, 666 F. App'x at 139 (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)).

Courts must be careful to "'not define clearly established law at a high level of generality' but, instead, conduct this analysis 'in light of the specific context of the case.'" *See Newman v. City of Philadelphia*, __ F. Supp. 3d __, 2020 WL 7640928, at *7 (E.D. Pa. Dec. 23,

2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  "[C]learly established rights are

derived either from binding Supreme Court and Third Circuit precedent or from a robust

consensus of cases of persuasive authority in the Courts of Appeals."  *See id.* (quoting *Bland v.*

*City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018)).  The matter of qualified immunity need not be

addressed if the court determines that no underlying constitutional violation occurred.  *See*

*Schieber v. City of Philadelphia*, 320 F.3d 409, 423 (3d Cir. 2003); *Torres v. McLaughlin*, 163

F.3d 169, 174-75 (3d Cir. 1998).

C.    **Sovereign Immunity – Review of Applicable Law**

Pennsylvania law generally provides for the sovereign immunity of officials and

employees acting within the scope of their duties.  *See* 1 Pa. Cons. Stat. § 2310.  Section 2310

states, in relevant part,

> it is hereby declared to be the intent of the General Assembly that the
> Commonwealth, and its officials and employees acting within the scope of their
> duties, shall continue to enjoy sovereign immunity and official immunity and
> remain immune from suit except as the General Assembly shall specifically waive
> the immunity.

*Id.*

Notwithstanding, Pennsylvania law contains an explicit waiver of sovereign immunity

under certain circumstances.  *See* 42 Pa. Cons. Stat. § 8522(a).  Therein, the General Assembly

waives,

> in the instances set forth in subsection (b) only and only to the extent set forth in
> this subchapter and within the limits set forth in section 8528 (relating to limitations
> on damages), sovereign immunity as a bar to an action against Commonwealth
> parties, for damages arising out of a *negligent* act where the damages would be
> recoverable under the common law or a statute creating a cause of action if the
> injury were caused by a person not having available the defense of sovereign
> immunity

*Id.* (emphasis added).

The General Assembly has only waived sovereign immunity for the commission of a "negligent act."  *See* 42 Pa Cons. Stat. § 8522(a).  "The commission of . . . intentional torts cannot be fairly characterized as 'negligence.'"  *Zion v. Nassan*, 283 F.R.D. 247, 265-66 (W.D. Pa. 2012) (citing *Aetna Cas. & Sur. Co. v. Roe*, 650 A.2d 94, 103 (1994)).  Therefore, an intentional tort "does not qualify as a 'negligent act' within the meaning of section 8522(a)."  *See id.* (citing *Strothers v. Nassan*, Civ. A. No. 08-1624, 2009 WL 976604, at *12 n.12 (W.D. Pa. Apr. 9, 2009).

Accordingly, Pennsylvania has not waived sovereign immunity for the commission of intentional torts by an official or employee acting within the scope of one's employment.  *See* 1 Pa. Cons. Stat. § 2310; 42 Pa. Cons. Stat. § 8522(a).  Conduct falls within the scope of one's employment

> if it is the kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated, at least in part, by a purpose to serve the employer; and if force is intentionally used by the employee against another, it is not unexpected by the employer.

*See Zion*, 283 F.R.D. at 266 (citing *Natt v. Labar*, 543 A.2d 223, 225 (1988)).

"Where the use of force is involved, the scope of an individual's employment depends on the expectations of his or her employer."  *See id.* (citing *Strothers*, 2009 WL 976604, at *8).  The Supreme Court of Pennsylvania "has long held that whether a particular act of an employee is within the scope of his employment is ordinarily a question of fact for the jury."  *See Justice v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019) (collecting cases).  "[T]he only exception to this well-established rule is where neither the facts nor the inferences to be drawn from them are in dispute."  *See id.* (citing O*rr v. William J. Burns Int'l Detective Agency*, 12 A.2d 25, 27 (Pa. 1940).  "However, where more than one inference may be drawn from the facts, the issue of

whether an employee was acting within the scope of employment is for the jury." *See id.* (citing *Iandiorio v. Kriss & Senko Enters., Inc.*, 517 A.2d 530, 534 (1986)).

## IV.   ANALYSIS

Steely asserts one claim of excessive force under the Fourth Amendment and state law claims for assault and battery.  Each of these claims is reviewed in turn below.  Based on this Court's observations of the testimony and evidence presented at trial, as well as the findings of fact reached above, this Court finds the testimony of Clemons to be credible and the testimony of Steely to be not credible.  Following the application of the governing law to the evidence presented at trial, and having weighed the credibility of the testimony, this Court concludes that Steely has failed to establish either claim by a preponderance of the evidence.

### A.   Fourth Amendment Excessive Force Claim

In order to establish a Fourth Amendment excessive force claim, Steely must establish that Clemons' seizure of him was unreasonable.  In particular, because the use of deadly force constitutes the seizure, Steely must establish that it was objectively unreasonable for Clemons to believe that deadly force was necessary to prevent Steely's escape, and Steely posed a significant threat of death or serious injury to Clemons or others.  *See Abraham*, 183 F.3d at 289.  In determining whether Clemons held a reasonable belief and therefore reasonably applied deadly force, this Court must review the "totality of the circumstances."  *See id.* at 292.  The first dispute to be addressed involves the appropriate starting point for this totality analysis.

As this Court indicated in its Opinion dated July 2, 2021, disputed material facts precluded a determination on summary judgment of whether this Court should consider the facts of the pursuit in assessing the reasonableness of Clemons' use of force.  *See* Op. 7/02/21 at 10-11; *see also Peroza-Benitez v. Smith*, 994 F.3d 157, 171 n.7 (3d Cir. 2021) (indicating that

whether pursuit was ongoing and whether defendant posed a live threat to officers at time of seizure were questions for fact finder).  Based upon the facts as this Court finds them, the events of the pursuit that transpired before the application of force are appropriately considered as part of the totality of the circumstances.  In *Peroza-Benitez*, the Third Circuit concluded that a suspect's dangerous actions prior to his or her seizure may be considered as part of the totality of the circumstances, but only if the danger from those actions had not subsided at the time the force was applied.  *See Peroza-Benitez*, 994 F.3d at 171 n.7.  When a suspect engages in dangerous actions preceding the use of force and the threat of harm or risk of flight created by those actions has not subsided at the time the force is applied, the pre-force actions should be considered part of the totality of the circumstances.  *See id.*  Conversely, where the prior threat of harm or risk of flight subsides before the force is applied, an officer may not use the prior threat to justify the subsequent use of force.  *See id.*  Here, the facts indicate that the threat of serious bodily harm and risk of flight that Steely posed were ongoing from the time Clemons initiated the traffic stop through Steely's eventual arrest.  The facts indicate that Steely's efforts to evade Clemons in his vehicle placed both Clemons' life and the lives of other motorists at risk.  During the nearly five-mile pursuit, Steely reached reported speeds of over ninety miles per hour on a stretch of I-95 where the speed limit is fifty-five miles per hour.  In addition, the dash cam footage shows that Steely made several abrupt lane changes, weaving in and out of traffic in the process.  Twice during the pursuit, Steely's actions nearly caused Clemons to collide with an exit-ramp divider.

Even after Clemons performed the PIT maneuver on Steely's vehicle, the facts indicate that Steely still posed a risk of flight and harm to Clemons and others.  This Court credits Clemons' testimony that, following Clemons' exit from his police vehicle, Steely was engaged in

an effort to free his car from the barrier on which it came to rest.  When Steely could not free his

car from the barrier, he began reaching for the driver and passenger doors to exit the vehicle.

When Steely appeared unable to exit the vehicle, he instead grabbed his book bag and shielded

both of his hands from view by reaching into it, leading Clemons to believe that Steely was about

to use a weapon to cause him harm.  Moreover, even after Clemons discharged his weapon,

Steely continued his efforts to evade arrest.  It took the aid of two civilians and additional

officers to handcuff Steely.  In totality, Steely's actions following the PIT maneuver were

consistent with his efforts to evade Clemons during the preceding pursuit.  Put another way, the

threat of harm and risk of flight remained active from the time the pursuit initiated until the force

was applied.  Therefore, it is appropriate to consider the whole of the events, beginning with the

pursuit, in the totality of the circumstances analysis.

 Having set the boundaries of the applicable test, Steely must establish that, in light of the

totality of the circumstances, Clemons' use of deadly force was unreasonable.  In particular,

Steely must establish by a preponderance of the evidence that Clemons lacked an objectively

reasonable belief that (1) deadly force was necessary to prevent Steely's escape, and (2) that

Steely posed a significant threat of death or serious physical injury to Clemons or others.  Based

on the facts as this Court has found them, Steely has failed to carry that burden, and accordingly,

Steely has failed to make out a violation of the Fourth Amendment.

 **1.   Clemons held an objectively reasonable belief that the use of deadly**

**force was necessary to prevent Steely's escape.**

 Beginning with the first element, Clemons' belief that deadly force was necessary to

prevent escape was objectively reasonable under the totality of the circumstances.  When

Clemons attempted to initiate a traffic stop based on Steely's abrupt lane changes and excessive

rate of speed, Steely did not yield.  Instead, Steely dangerously weaved in and out of traffic at speeds of over ninety miles per hour in an effort to evade Clemons.  Steely's actions during the pursuit placed Clemons and dozens of other motorists at a high risk of severe bodily injury or death.  Twice during the chase, Clemons nearly collided with exit ramp dividers due to Steely's abrupt lane changes between the exit ramp and the highway lanes of travel.  These events are not only evident in Clemons' testimony, which this Court finds credible, but they are corroborated by the dash cam footage captured by the MVR.

Additionally, this Court credits the testimony of Clemons regarding the events that took place after he performed the PIT maneuver on Steely's vehicle.  Clemons indicates that Steely's efforts to flee did not cease; instead, Steely tried to free his car from the barricade on which it rested.  When Steely realized the car could not be freed, Steely began reaching for both the passenger and driver-side doors in an effort to exit the vehicle.  When Steely appeared unable to exit the vehicle, he obtained his book bag and proceeded to reach both of his hands inside of it.  Even after Steely eventually exited the car, and despite his gunshot wound, his efforts to flee did not cease.  Two civilian bystanders attempted to help Clemons apprehend Steely.  However, in light of Steely's relentless efforts to resist apprehension, the three individuals were unable to handcuff him.  It was not until additional officers arrived that Steely was able to be handcuffed.

The totality of Steely's actions leading up to the seizure—and even the events that transpired after the seizure—are indicative of an individual who would do anything to avoid capture.  When Clemons initiated the traffic stop, Steely accelerated and weaved his way through dense traffic to avoid capture.  When Clemons performed the PIT maneuver, Steely still made several efforts to flee.  Even after deadly force was applied, Steely continued to resist capture.  Accordingly, in light of the credible testimony of Clemons and based on the totality of the

circumstances, this Court finds that Clemons held an objectively reasonable belief that deadly

force was necessary to prevent Steely's escape.

> ### 2. Clemons held an objectively reasonable belief that Steely posed a significant threat of death or serious injury to Clemons or others.

In order to render an officer's use of deadly force reasonable under the Fourth

Amendment, the officer must also hold an objectively reasonable belief that the suspect posed a

significant threat of death or serious physical injury to the officer or others. *See Abraham*, 183

F.3d at 288. Based on the totality of the circumstances as this Court finds them, this Court

concludes that Clemons held an objectively reasonable belief that Steely posed such a threat of

death or serious injury to Clemons and others.

Beginning with the pursuit itself, Steely's actions placed the life and limb of dozens of

motorists at risk. Both the testimony and dash cam video show Steely weaving through dense

traffic at reported speeds of over ninety miles per hour. Moreover, twice during the pursuit,

Steely's maneuvering nearly caused Clemons to collide with an exit ramp divider. This Court

credits Clemons' belief that these near collisions were not merely accidental, but rather a

purposeful part of Steely's effort to evade Clemons. Although Steely claims that his dangerous

driving maneuvers are simply explained by the fact that he did not exactly know which exit to

take, this explanation lacks credibility. Accordingly, this Court concludes that it was reasonable

for Clemons to believe that Steely posed a significant risk of death or serious injury to both

Clemons and other motorists during the pursuit itself.

Following the PIT maneuver, it was reasonable for Clemons to persist in his belief that

Clemons posed a significant risk of death or serious injury to Clemons and others. This Court

credits Clemons' testimony that, even after the PIT maneuver, Steely's behavior indicated that he

had not abandoned his plan to avoid capture at any cost.  As both the testimony and audio from

Clemons' lapel microphone demonstrate, Steely did not heed any of Clemons' commands.

Clemons began by providing Steely with a warning that he would use deadly force if necessary.

Clemons then ordered Steely to stop reaching three times.  Rather than obey these orders, Steely

made several reaching motions around the vehicle.  Some of those were attempts at escape, and

one of them involved Steely's procurement of and engagement with a book bag.  Despite

Clemons' commands, Steely reached both hands into his book bag giving the appearance of

going after something in the book bag, eventually removing them in an abrupt upward motion.

Based on Steely's actions during the entirety of the pursuit, his failure to adhere to any of

Clemons' commands, his efforts at escape after the PIT maneuver, and the totality of the

dangerous and life-threatening activities that Steely undertook, Clemons held an objectively

reasonable belief that Steely posed a significant threat of death or serious injury to Clemons and

others.

 To be sure, this case shares numerous similarities to factually comparable deadly force

cases in which the use of force was deemed reasonable.  In *Manis v. Lawson*, the Fifth Circuit

upheld an officer's use of deadly force where the suspect "reached under the seat of his vehicle

and then moved as if he had obtained the object he sought."  585 F.3d 839, 844 (5th Cir. 2009).

Similar to the suspect in *Manis*, who shielded his hands from the officer's view by reaching

under his seat, Steely made a reaching motion into a book bag, at which point Clemons could no

longer see his hands.  Additionally, like *Manis*, Steely made a straightening-up motion as if he

had retrieved the object sought, prompting Clemons to discharge his service weapon.  *See also*

*Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) (finding reasonable an officer's use of deadly

force against a suspect even thought it was later discovered that the suspect did not have a

weapon).  In light of the totality of the circumstances in this case, it was reasonable for Clemons

to believe that Steely's reaching motion and abrupt movement thereafter posed a significant risk

of death or serious bodily injury to Clemons or others.

In another factually similar matter, *Hale v. City of Biloxi, Mississippi*, the Fifth Circuit

reaffirmed that the use of deadly force may be reasonable when "a suspect moves out of the

officer's line of sight such that the officer could reasonably believe the suspect was reaching for

a weapon."  731 Fed. App'x 259, 262 (5th Cir. 2018) (quoting *Manis*, 585 F.3d at 844).  In *Hale*,

the suspect ignored orders to keep his hands visible and instead placed his hands in his pocket,

prompting the officers' belief that the suspect was reaching for a weapon.  *See id.* 262-63; *see*

*also id.* at 262 (noting officer provided warning that defendant was "about to get shot" if he did

not comply).  In affirming the district court's grant of summary judgment in favor of the officers,

the court indicated that the use of deadly force may be reasonable even where the suspect is not

"wanted for a violent offense, resisting or fleeing arrest, or clearly brandishing a weapon."  *See*

*id.* 264.  Similar to *Hale*, Steely ignored Clemons' repeated commands to stop reaching as well

as Clemons' warning that he would use deadly force if necessary.  Instead, similar to what *Hale*

did with placing his hands in his pockets, Steely also shielded his hands from Clemons' view by

placing them in his book bag, in contravention of Clemons' commands.  Moreover, while *Hale*

did not involve any flight or resisting arrest, both of those aggravating factors are present here.

Based on the testimony and additional evidence, this Court concludes that Clemons used

deadly force based on an objectively reasonable belief that (1) such force was necessary to

prevent Steely's escape, and (2) Steely posed a significant risk of death or serious injury to

Clemons or others.  Because Clemons applied deadly force based on these objectively reasonable

beliefs, such force did not amount to an unreasonable seizure under the Fourth Amendment.

Therefore, Steely has failed to carry his burden of establishing a violation of the Fourth Amendment, and judgment is entered in Clemons' favor on this claim. Because Steely has failed to make out a violation of the Fourth Amendment, this Court does not reach the question of qualified immunity. *See Schieber*, 320 F.3d at 423; *Torres*, 163 F.3d at 174-75.

**B.      Assault and Battery Claims**

Steely's remaining claims against Clemons involve tort law claims of assault and battery. As this Court indicated in its Opinion dated July 2, 2021, Pennsylvania's law governing sovereign immunity bears on these claims. In order to maintain causes of action for assault and battery against Clemons, Steely must establish that Clemons was acting outside of the scope of his employment at the time that he engaged in those intentional torts. *See* 1 Pa. Cons. Stat. § 2310; 42 Pa. Cons. Stat. § 8522(a). In determining whether an employee acted within the scope of their employment, the fact finder is to consider (1) the "kind and nature" of the work the employee is employed to perform, (2) whether the conduct occurred "within the authorized time and space limits" of the employment, (3) whether the conduct served the employer, and (4) whether this sort of intentional force was unexpected by the employer. *See Zion*, 283 F.R.D. at 266 (citing *Natt*, 543 A.2d at 225).

Under the facts as the Court finds them, Clemons' use of force was within the scope of his employment. At the time Clemons encountered Steely, Clemons was performing his patrol duties as a Pennsylvania State Trooper. He encountered Steely while driving his marked police SUV and while wearing his full uniform. Moreover, Steely has failed to establish that the sort of force used by Clemons was not expected by his employer, the Pennsylvania State Police. The Pennsylvania State Police trains its officers on the use of force, which includes training on the

use of deadly force.  In addition, the Pennsylvania State Police maintains a policy on the use of deadly force.

That the Pennsylvania State Police trains its officers on the use of deadly force and maintains a policy on the same indicates they expect their employees may use deadly force in certain circumstances.  This Court determines that Clemons held an objectively reasonable belief that (1) such force was necessary to prevent escape and  (2) Steely posed a significant threat of death or seriously bodily injury to Clemons or others.  All of these considerations lead this Court to conclude that Clemons' use of force falls within the scope of his employment.

Pennsylvania has not waived sovereign immunity for the commission of intentional torts by an official or employee acting in this scope of his employment.  *See* 1 Pa. Cons. Stat. § 2310; 42 Pa. Cons. Stat. § 8522(a).  Accordingly, because Clemons' use of force occurred within the scope of his employment, sovereign immunity acts as a bar to Steely's tort claims against Clemons.  Therefore, judgment is entered in Clemons favor on Steely's assault and battery claims.

## V.    CONCLUSIONS OF LAW

1.    Clemons' belief that Steely posed a significant threat of death or serious physical injury to Clemons' or others was reasonable.

2.    Clemons' belief that the use of deadly force was necessary to prevent Steely's escape.

3.    Under the totality of the circumstances, Clemons' use of force was reasonable.

4.    Because Clemons' use of force was reasonable, Steely has not established a constitutional violation.

5.     Because Steely has not established a constitutional violation, this Court does not reach the question of qualified immunity.

6.     Clemons' use of force is of the kind and nature that he is employed to perform, and it was not unexpected by his employer, the Pennsylvania State Police.

7.     Clemons' use of force falls within the scope of his employment.

8.     Because Clemons' use of force falls within the scope of his employment and Pennsylvania has not waived sovereign immunity for the commission of intentional torts undertaken within the scope of employment, sovereign immunity acts as a bar to Steely's assault and battery claims against Clemons.

9.     Judgment is entered in favor of Clemons and against Steely on all counts.

A separate Order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge